2026 IL App (1st) 240103-U

SECOND DIVISION
March 10, 2026

No. 1-24-0103

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 23 CR 03808 |
| | ) | |
| ROMAN JUAREZ-HERNANDEZ, | ) | |
| | ) | Honorable Charles P. Burns, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice Van Tine and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1    ***Held:***  The evidence was sufficient to convict defendant of first degree murder. The trial court did not err in limiting defendant's closing argument. Defendant's sentence is not excessive. Affirmed.

¶ 2    Following a bench trial, defendant Roman Juarez-Hernandez was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2016)) and sentenced to 50 years' incarceration. On appeal, he contends that (1) the evidence was insufficient to establish his guilt, (2) the trial court improperly limited his closing argument, and (3) his sentence is excessive. We affirm.

¶ 3                                    BACKGROUND

¶ 4      At around 5:43 a.m. on December 16, 2015, Javier Enriquez[1] was found lying face down in the front yard of 1754 North Luna Street in Chicago, naked except for a "woman's style shoe" on one of his feet and with approximately 45 stab wounds and numerous other injuries. On July 22, 2022, defendant was extradited from Mexico in connection with this offense and charged with three counts of first degree murder. Trial began on July 10, 2023. After admonishing defendant, the trial court granted his request to proceed *pro se*, and the following evidence was adduced.

¶ 5      Ezequiel Enriquesecz-Sanchez testified that the victim was a family member and that they worked together. Enriquesecz-Sanchez stated that, on December 15, 2015, he had worked with the victim until around 7 p.m. They then went to a friend's garage and drank some beer before going back to Enriquesecz-Sanchez's house, where they stayed until around midnight. The victim then said that he was hungry and going home.

¶ 6      Chicago police detective Dean Lakis testified that, in December 2015, he was a uniformed patrol officer "working a beat car." Lakis stated that, at around 5:43 a.m. on "December 6 [*sic*], 2015," he was dispatched to 1754 North Luna. When he arrived, he saw the victim lying face down in the front lawn unresponsive, naked but with a woman's style shoe on his foot and multiple lacerations and "puncture wounds." Lakis saw blood around the victim and on the building next door, as well as the path leading from the sidewalk through the common area of the victim's residence, down the stairs to the victim's basement apartment, and leading through the apartment into the victim's bedroom in the back of the unit. Lakis heard sounds from the other bedroom, and when he entered that other bedroom, he saw the victim's roommate (Jose Tolentino), whom Lakis described as disheveled and like he had just awoken. Lakis saw no one else in the apartment.

---

[1]  The victim's last name is also spelled "Enriquesecz" in the report of proceedings.

¶ 7     Jose Tolentino testified that, in 2015, he and the victim shared an apartment at 1752 North Luna. At the time of the victim's murder, he had known both the victim and defendant for about 10 years: Tolentino had gone to school with defendant, and he knew the victim through family. When asked, Tolentino said that the victim and defendant had known each other for "many years[,] 20." The three of them and defendant's brothers, Hector and Fabian Juarez, worked installing granite countertops, although they worked for different companies.

¶ 8     Tolentino stated that he, the victim, and defendant would go out and socialize, but at some point in 2015, Tolentino's relationship with defendant gradually changed, and they were no longer friends by the time of the victim's murder. Tolentino thought the deterioration in his relationship with defendant took place three or four months before the victim's murder.

¶ 9     Tolentino then testified that, on December 15, 2015, he went out "fooling around with some girlfriends" that evening after work. He smoked marijuana that evening but did not drink. He then went home to his and the victim's basement apartment. The victim was not home at that time. Tolentino noted that his bedroom is on the "opposite side of the basement," about 30 feet from the victim's bedroom. Tolentino then went to sleep.

¶ 10    Tolentino, however, testified that he woke up in "the middle of the night" because of some noises that he described as "like, when somebody is drunk and is hitting the wall." Thinking that it was the victim returning from his job, Tolentino went back to sleep. Tolentino then woke up a second time, however, because he heard what he believed was someone walking around picking up glass bottles. Tolentino did not at any point hear anyone screaming or struggling and again merely thought it was defendant coming home.

¶ 11    Eventually, Tolentino heard the police knock on his door. After getting dressed, he opened the door, and then the police "put the lights on my face," took him from the room while holding

him by the neck, "thr[e]w" him into the police car, and took him to the police station. Tolentino did not know what was going on and saw blood on the floor of the apartment that had not been there previously. At the police station, Tolentino told the police what he saw and heard that night, and he gave them the name of an individual that the victim "had *** problems with."

¶ 12    Tolentino testified that the victim used to have girlfriends and had a girlfriend in 2015 who sometimes stayed with them. When the State asked him if he had ever known the victim to wear women's clothing, Tolentino stated, "No, never."

¶ 13    Bryan Holy testified that he was retired at the time of trial, but on December 16, 2015, he was a Chicago police detective assigned to investigate the victim's murder. Holy went to the scene and canvassed the area. Holy spoke to Tolentino and the victim's cousins, who lived in an upstairs apartment in the same building. Following his conversation with Tolentino, Holy began looking for defendant. Holy went to a residence in Cicero, Illinois, but no one answered the door. He then went to a nearby grocery story looking for defendant's girlfriend, later identified as Luz Ochoa. Holy went with Chicago police detective Rolando Rodriguez, who spoke Spanish.

¶ 14    At the grocery store, the detectives spoke with Ochoa, who had not seen defendant "for a day." The detectives and Ochoa then returned back to the residence that she shared with defendant and their three-year-old daughter. After obtaining consent to search, the detectives looked for defendant in the house but did not find him. Ochoa directed the officers to defendant's pickup truck keys, house keys, and cell phone. They then went to the backyard, where they saw defendant's pickup truck. After seeing "numerous quantities" of blood stains on the exterior and through the window into the interior area on the driver's side of the pickup truck, the detectives stopped the search while one of the officers left to obtain a search warrant. Holy confirmed that, during the time they were at the residence, defendant had never returned. At some point,

4

defendant's father, Jose Juarez, arrived but told investigators that he had not seen defendant. Holy further noted that another detective interviewed defendant's brothers, Hector and Fabian Juarez, but neither brother knew where defendant was.

¶ 15   After obtaining the search warrant, Holy said that Ochoa pointed them to defendant's cell phone and keys to his pickup truck. Holy added that a warrant was issued for defendant's arrest on December 21, 2015, and Holy requested assistance from the FBI in locating defendant. In late 2015 or early 2016, defendant's phone was sent to the "FBI forensic laboratory" to try and unlock the phone and access the information on it, but according to Holy, the technology to do so was not available to the FBI at that time, so no analysis was possible.

¶ 16   Rolando Rodriguez testified that he had retired from the Chicago police department in August 2020, but on December 17, 2015, he was a Chicago police detective assigned to investigate the victim's homicide with then-Detective Brian Holy. Rodriguez and his partner met Holy at defendant's house and then proceeded to a "Spanish grocery store" nearby to find Ochoa. Ochoa told Rodriguez that she did not know where defendant was and returned with the officers to her home. She consented to the officers' request to search the home, but they did not find defendant. Ochoa also opened the door to the detached garage, and the officers found defendant's truck. Rodriguez stated that there appeared to be blood stains on several places in the truck, so the investigators paused their search while one of them went to obtain a search warrant. Chicago police detective Michael Lipsy testified that, on December 17, 2015, after obtaining Ochoa's consent to search defendant's and her residence, he recovered a white cell phone that Ochoa indicated belonged to defendant.

¶ 17   Ochoa testified that she was defendant's former partner and had a child, who was 12 years old at the time of trial, with him. She stated that she had known defendant since 2002 or 2003 and

first met him in Mexico City, where they had both lived at the time. Ochoa stated that, on December 15, 2015, after having worked that day and attended an English class, she returned home to have dinner with defendant and their daughter, who was three years old at that time. After dinner, at around 10 p.m., defendant told Ochoa that he was going to the bar at the corner for some drinks. Ochoa believed that defendant walked to the bar because she saw his keys to his pickup truck still hanging on the wall. Ochoa stated that she occasionally drove the truck but was unaware of anyone else using it. She said that there was only one set of keys that defendant kept with him when he was not at home. After defendant left for the bar, Ochoa and her daughter went to sleep, and Ochoa did not see him again until she had to appear in court regarding the instant offense. Ochoa stated that defendant never told her that he was leaving the country.

¶ 18 Ochoa confirmed that she met with detectives at the grocery store where she worked on December 17, 2015, and that she accompanied them back to her residence, where she allowed them to search her home. Ochoa then went with detectives to the police station to speak with them.

¶ 19 Chicago police detective Bernard Veleta testified that, on July 22, 2022, he was assigned to go to O'Hare airport and take custody of defendant from the FBI. After taking custody of defendant, Veleta then obtained a buccal swab from defendant pursuant to a search warrant. Veleta further stated that he received defendant's cell phone from an FBI agent, which he subsequently identified as People's Exhibit 4. Veleta said that the phone he received from the FBI agent was the same phone that was obtained in 2015, because each cell phone has an "IMEI"[2] number, which he explained is "a unique 15[-]digit number that is—essentially it's kind of like a fingerprint for

---

[2] IMEI is an acronym for "International Mobile Equipment Identity" and is defined as a "unique identification number programmed into GSM and UMTS mobile devices." See "Glossary," "International Mobile Equipment Identity (IMEI)," *available at* https://csrc.nist.gov/glossary/term/international_mobile_equipment_identity (last accessed February 11, 2026) [https://perma.cc/5UE2-DTQM].

the cell phone. It's unique to all cell phones that are made." Veleta then confirmed that the IMEI number for the phone obtained in 2015 was the same as the phone the FBI agent tendered to him. Veleta then explained that, when the phone had been seized in 2015, the technology at the time did not exist to unlock the phone. The technology, however, did exist in 2023, so Veleta obtained a search warrant to unlock the phone and tendered it to Chicago police officer Kuczek, who was working in the "area technology center" (ATC).

¶ 20 Chicago police officer Kamil Kuczek testified that he has worked as a police officer for about ten years and has been assigned to the ATC for the past three years. His duties primarily involve "forensic data extraction" from cell phones. He received specialized training and has conducted approximately 20 to 25 cell phone extractions during his career.

¶ 21 Kuczek stated that he performed a forensic extraction of the cell phone identified as People's Exhibit 4. He further testified that the phone was (1) set to central standard time, (2) identified as "Roman's iPhone," and (3) associated with an email address bearing the defendant's surname and the number "5384."[3] He testified that a prior attempt to unlock the phone had been unsuccessful but that he was able to unlock the device and extract its data using forensic software. Reports generated from the data included call log reports, activity sensor reports, location data summaries, and maps that were created from the location data. Kuczek confirmed that the data was computer-generated and not subject to human manipulation.

¶ 22 The call log reports revealed no phone activity after 9:19 p.m. on December 15, 2015, and then multiple short outgoing calls between 5:51 a.m. and 5:59 a.m. on December 16, 2015. Kuczek did not see similar clustered calling activity during the early morning hours on other days within the examined period. Kuczek added that "activity sensor data" reflected limited movement

---

[3] The record indicates that defendant's date of birth is May 3, 1984.

beginning at around 9 p.m. on December 15, 2015, increased step activity between 1 a.m. and 2 a.m. on December 16, 2015, and then a substantial increase between 5:19 a.m. and 5:58 a.m. With respect to location data that was extracted from the phone, Kuczek explained that the data reflected multiple recorded locations between approximately 9:45 p.m. on December 15, 2015, and 5:51 a.m. on December 16, 2015, including locations "a little bit" west of addresses at 1752 North Luna and 3620 South 53rd Court in Cicero.

¶ 23    On cross-examination, Kuczek acknowledged that, although certain extracted data included references to "hot spot activity" dated January 1, 1970, it was not possible for "any" cell phone to have had any such activity in 1970. Kuczek further admitted that the "location services" on the phone's settings were not enabled, and he could not explain how it is possible for a device to send a location signal if it is disabled. Kuczek agreed that the one of the location entries indicated that, within less than two hours, the device was in Mokena, Illinois, and then Delaware. Kuczek also agreed that there were further location anomalies showing the phone in "two different places at the same time," including one anomaly showing the phone both in Wausau, Wisconsin, and also at 1752 North Luna in Chicago. When asked whether he "might say that there [are] many flaws in this data," Kuczek answered, "That[,] I don't know." Kuczek could not explain the source of those anomalies and confirmed that the information was accurate and came from the cell phone. Kuczek further conceded that he was not a "specialist" and only knew how to extract information from the cell phone.

¶ 24    Dr. Stephanie Powers testified as an expert in forensic pathology. Powers stated that she has been an assistant medical examiner at the Cook County Medical Examiner's Office since 2016, and that she performed the victim's autopsy on December 17, 2015. During her external examination, Powers noted multiple traumatic injuries, including 45 sharp force injuries, which

comprised stab wounds (*i.e.*, a wound that is "deeper than it is long") and incised wounds (*i.e.*, a wound that is "longer than it is deep"), as well as "multiple" blunt force injuries. Approximately 15 sharp force injuries were present on the head and neck, including 11 stab wounds. Notably, two stab wounds to both sides of the neck injured the right and left jugular veins. The wound to the right side of the victim's neck was about 4 inches deep, and the wound to the left side of the neck was 1.75 inches deep. A 2.25-inch-deep stab wound to the back left side of the victim's neck "passed through deep enough to injure the backside of the esophagus." An additional 5-inch-deep stab wound to the left side of the victim's face further injured the esophagus near the hyoid bone.

¶ 25 Powers then stated that the victim's torso exhibited 21 sharp force injuries, several of which penetrated up to 3.5 inches into the victim's body, injuring various internal organs including the bladder and small intestine. In particular, Powers noted that one abdominal wound resulted in "loops" of the victim's bowel protruding through the abdominal wall. Other stab wounds injured the victim's spinal cord nerves and the muscles in between his ribs.

¶ 26 Powers observed seven incised wounds on the victim's hands, which she characterized as defensive wounds, consistent with the victim's attempts to protect himself during the attack. Powers explained that the victim's right forearm exhibited two connected 2.5-inch-deep stab wounds that passed through the soft tissues. Powers stated that these wounds also "may be" consistent with a defensive wound.

¶ 27 With respect to blunt force injuries, Powers described "multiple" contusions on the victim's face, head, neck, jaw, and extremities; a fractured nose with associated hemorrhage; a fractured hyoid bone; a subdural hemorrhage; and hemorrhage of the scalp. The internal examination of the victim revealed hemorrhaging to both testicles, but no perforating injury, consistent with blunt

trauma. Powers further discovered petechial hemorrhages in the victim's left eye, which can be associated with "asphyxial events," such as strangulation or suffocation.

¶ 28    Toxicology testing revealed the presence of alcohol but no other drugs, and Dr. Powers determined that the decedent had been metabolizing (but no longer consuming) alcohol at the time of death. Based upon her findings, Powers opined that the cause of the victim's death was multiple sharp force injuries and that the manner of death was homicide.

¶ 29    Elizabeth Vera, an evidence technician with the Chicago Police Department, testified that, at around 7 a.m. on December 16, 2015, she processed multiple related crime scenes at 1752 and 1754 North Luna. Upon arriving, she observed "a lot" of blood throughout the interior of the residence at 1752 North Luna, in the exterior areas between the two properties, and at 1754 North Luna, where the victim was found lying in the yard. Vera described the blood as "saturated in the grass and all around [the victim's] body and *** the building." In the victim's bedroom, Vera stated that there was blood "everywhere," not just on the mattress and floor, but also on the walls and ceiling. Vera photographed and video recorded the scenes, placed markers, and collected physical evidence, including blood swabs (from walls, floors, ceilings, sidewalks, vehicles, and other surfaces) as well as beer bottles and cans, and a pair of "white thong lace panties wrapped around a plastic bag with blood" in front of 1752 North Luna. Vera further recovered a single cell phone and two cell phone boxes. The trial court granted the State's request to publish the crime scene video and some of the photographs to the court.

¶ 30    Vera conceded that some photographs were inadvertently lost during the process of copying the photographs from the camera's memory card and could not be recovered, but she explained that the missing images were nonetheless captured on the crime scene recording. Vera confirmed that the recording accurately depicted the crime scenes at 1752 and 1754 North Luna.

¶ 31    Vera then testified that, on the next day, she processed an additional related scene at a residence in Cicero, Illinois.  Vera photographed the interior of the residence, a garage, and a pickup truck, and she then collected the keys to the pickup truck, blood swabs from approximately 13 locations on the interior and exterior of the truck, and additional physical evidence.

¶ 32    Subsequent DNA testing revealed that the victim's DNA was found in the blood on one of the parked cars and on the interior and exterior of defendant's truck.  Two swabs of blood on the steering wheel of defendant's truck contained the victim's DNA as a major profile and defendant's DNA as a minor profile, with the statistical frequencies of the minor profile being 1 in 41 million and "1 in 49," respectively.  Oral, penile, and anal swabs were also taken from the victim, and the DNA on those swabs were only those of the victim; defendant's DNA was excluded.

¶ 33    Hector Juarez testified that he was defendant's brother and that he used to work with defendant between 2005 through 2008.  Hector stated that he had seen defendant in November 2015, "around *** [the] [T]hanksgiving holidays," but did not recall whether he ever saw defendant again prior to trial.  When asked, Hector said he did not remember testifying before the grand jury on April 6, 2016.  The State then confronted Hector with a transcript of his grand jury trial in which he testified that the last time he saw defendant was before November 2015; Hector responded, "It's been a long time ago.  I don't remember."

¶ 34    The State then asked, "Did [defendant] tell you that he felt like he had been raped by [the victim]?"  Hector responded, "No, because we did not talk a lot, and we did not interact too much."  The State then confronted Hector with a transcript of his grand jury testimony.  Hector stated that he did not recall testifying to the grand jury that, one time, "between March and April and May," defendant told Hector and their brother Fabian about an incident involving the victim.  Hector, however, admitted testifying to the grand jury that defendant was drinking in defendant's truck

with Tolentino and the victim, and at some point, Tolentino suggested that defendant spend the night so that defendant could drink and would not "drive drunk." The State then recited a portion of the transcript of Hector's grand jury testimony in which Hector testified that (1) defendant recounted "wanting to move and that he felt that he was being held down, he couldn't move," (2) defendant "said that he felt that he was being raped," and (3) "they [*sic*] had raped him through the anus." Hector, however, said he did not remember making those statements to the grand jury.

¶ 35    Fabian Juarez testified that defendant is his brother and that Fabian knew the victim through work. In response to the State's question, Fabian said that he did not remember defendant telling him and Hector at work that, between March and June 2015, the victim had drugged and sexually abused defendant "[i]n their [*sic*] house." When confronted with a transcript of his grand jury testimony, Fabian further denied remembering both testifying to those facts and also having testified at all to the grand jury. The State later asked Fabian again whether defendant described being sexually assaulted by the victim, but Fabian responded that defendant "did not say that." The State then asked Fabian what specifically defendant did say, and Fabian replied, "No, he just told me that he left with him because that's where they gathered together."

¶ 36    Assistant State's Attorney Jose Villareal testified that, on April 6, 2016, he was assigned to present witnesses before the grand jury related to the victim's murder. Villareal confirmed that he questioned both Hector and Fabian before the grand jury. Villareal then reviewed a copy of the grand jury transcript of Hector's and Fabian's testimony. Villareal confirmed that the transcript was accurate, including the excerpts of Hector's and Fabian's testimony concerning defendant's claim of being sexually assaulted by the victim and Tolentino.

¶ 37    The State rested, and defendant opted not to present evidence. The cause then proceeded to closing arguments. The State argued in part that this murder represented "rage" and a "very

12

deeply personal" act.  The State also argued that defendant's motive was established from his brothers' grand jury testimony.  The State suggested that Tolentino's testimony that he heard "bottles clanking around in the middle of the night," was possibly a "ruse" to get the victim to let defendant into the apartment so that they could "have a late night beer together [and] catch up." Noting that (1) the black plastic bag that had female underwear around it was similar to the bag containing the beer bottles and (2) defendant believed the victim and Tolentino had drugged and raped him in their apartment after a night of drinking, the State argued that defendant "wanted to come back to the scene and *** humiliate" the victim by "making him wear women's clothing, women's sandals[,] and teach him a lesson for what he did."  The State further argued that, because of the extensive amount of blood throughout the crime scene, defendant "had to have been covered in" the victim's blood, which resulted in defendant getting the victim's blood all over his  truck.

¶ 38    During defendant's closing argument, he argued, *inter alia*, that the DNA analysis did not indicate when "the stains were made on the truck."  Defendant further added, "Also that truck was used *** for work which *** requires tools and it's a [*sic*] hard work in which many people get hurt."  The following exchange then took place:

"THE COURT:  Okay.  There's no evidence of that.

MR. JUAREZ [defendant]:  Well—

THE COURT:  You didn't introduce any—You can argue

inferences, sir, but there's no direct evidence of that.  But you can

*** definitely argue inferences that can be drawn from the evidence.

Go ahead."

Defendant then argued that, regarding the DNA analysis, "[T]he theory of the State is a fallacy" because the statistical probability does not identify "a person as a single source."

¶ 39    Following closing arguments, the trial court announced its ruling, finding defendant guilty on all counts. The court noted that, although the case was circumstantial, *i.e.*, there were no eyewitnesses, it was certain of two things:  (1) the victim was murdered and (2) the killer was inside defendant's pickup truck.  The court recalled the victim's numerous stab wounds and multiple blunt force injuries, many of which were inflicted by a sharp instrument "through the use of great force," as well as defensive wounds.  The court described the crime scene as "a bloodbath," with blood "all over":  in the victim's apartment, in the entranceway to the apartment, on the victim's apartment building, and on the grass and sidewalk.

¶ 40    The court also stated that there was "no doubt" that the killer was in the pickup truck in defendant's garage, the keys to which were found in defendant's home that he shared with Ochoa. The court added that it was not "just some random blood"; rather, it was the victim's blood that was "throughout" the inside and outside of the truck.  Noting that the truck was registered to defendant and that there was no evidence that anyone else had taken that truck or had access to the truck, the court concluded that it was defendant's truck where the victim's blood was found.

¶ 41    The court further found that defendant had a motive to hurt the victim because defendant had believed that the victim had raped him several months prior, and defendant had divulged that belief to his brothers, which was then introduced to the grand jury.  The court noted that the brothers recanted their statements when they testified, but the court considered as substantive evidence their prior sworn grand jury testimony that defendant had "complained that he was anally raped by the victim and his brother, that he dreamed it, that he thought he was being held down, and that he was raped at that point in time."

¶ 42    The court indicated that it did not "quite understand *** how the victim's roommate did not hear the struggle."  The court further found the State's arguments that defendant sought to

14

humiliate the victim by dressing him in women's clothing "pretty farfetched," observing the relative lack of evidence supporting that claim. The court additionally noted that the evidence from defendant's phone was not "very compelling."

¶ 43    The court, however, found defendant's disappearance immediately after the killing "extremely compelling." The court noted that, according to defendant's brothers and Ochoa, defendant "just disappeared." The court explained that defendant disappearing (leaving his phone behind) with no contact with Ochoa, his child, family, or employer for an extended period of time until his extradition from Mexico six years later indicated "consciousness of guilt." The court added that it would "belie common sense" that, immediately after "somebody was brutally stabbed, an individual would decide to go to Mexico and leave his wife and three-year-old child *** behind" and not be directly involved. The court concluded that, although there was no eyewitness, "the circumstantial evidence is overwhelming." The court then found defendant guilty.

¶ 44    The trial court continued the matter for a sentencing hearing and ordered the preparation of a presentence investigation report (PSI). The court also granted defendant's request for an attorney to represent him in posttrial proceedings. Defense counsel subsequently filed a motion for a new trial, which the court denied. The motion for a new trial did not challenge the court's statements during defendant's closing arguments.

¶ 45    At the sentencing hearing, the parties indicated that there were no changes needed to the PSI. The State presented five victim impact statements from the victim's mother, sisters, niece, and uncle. The statements in part informed the trial court that December (the month the victim was killed) is a "sad month" for the family. Many family members also described profound sadness, difficulty sleeping or accepting the victim's death, and feeling "very vulnerable" to the fear of "somebody coming back *** to do us *** harm."

15

¶ 46    The defense called defendant's father to testify in mitigation.  Defendant's father stated that he has a very good relationship with defendant and that he and defendant's mother, who resides in Mexico, speak with defendant two or three times per week.  Defendant's father further stated that defendant was a very good father to his daughter and has a good relationship with his brothers, as well.  Defendant's father stated that defendant has not had any contact with his daughter since he has been in custody, however, because he wanted to protect her from his incarceration and anything having to do with this case.  Defendant's father added, "Whatever happens, he is going to be my son[,] and I'm never going to stop supporting him."

¶ 47    Defendant's PSI indicated that he has a good relationship with his parents and maintains contact with them, and that he had a good childhood where all of his "basic needs" were met.  He denied any abuse or involvement with the Department of Children and Family Services, and he stated that his family is still supportive of him.  Defendant reported that no one in his immediate family was in the criminal justice system or has drug issues.  Defendant attended high school after coming to the United States and eventually achieved his GED, and he was never expelled or suspended from school.  He reported prior employment from 2003 to the date of the arrest as a customer service representative, construction worker, or a call center operator.  Defendant denied being affiliated with a street gang, and the PSI investigator found no record of any such activity.  Defendant added that he has close friends, and they have not been involved in any criminal activity.  Defendant said his only experience with a mental health professional was when his first daughter died.  With respect to substance use, defendant said he only consumed alcohol occasionally and never had any problems related to his alcohol use.  He denied any other type of drug use.

¶ 48    The State then presented its argument in aggravation.  The State argued in part that relevant aggravating factors included that defendant caused or threatened serious harm based upon the facts

of the case and that the sentence is necessary to deter others. The State then argued that the only factors in mitigation were defendant's lack of a prior criminal history and that defendant is "the parent of a child likely to be negatively affected." The State, nonetheless, argued that it believed that defendant's lack of a prior criminal history "could be actually aggravating" because, according to his PSI, he was brought up "in a loving family" and had a "great support system." The court then stated, "Well, I think you should rephrase that. I understand where you're going with that, but I don't see how I can ever say that someone not having a criminal background is aggravating, but go ahead, you can make your argument." The State then proceeded to note that, with respect to his child, defendant's sudden absence for over six years following the murder and that Ochoa "never heard from him again" reduced the mitigating effect of this factor. The State concluded that defendant should receive an "appropriate" sentence and not the minimum sentence.

¶ 49    Defense counsel asked the court for a minimum sentence because of his lack of a prior criminal history and his strong family support network. Counsel further informed the court that defendant had another daughter who had previously died at age 11 from cancer. Referencing defendant's PSI, counsel noted that defendant's "report is different than most of the social histories you hear about defendants that appear before you." After reiterating that this was defendant's "first case," counsel asked for a sentence "closer to the minimum of 20 years."

¶ 50    Defendant then made the following statement in allocution:

"Well, I'm the only victim in this situation. I'm a victim of the corruption of this court, of the criminal justice [system] that's prosecuting me in this case, the state's attorney, the assistant state's attorney, reckless investigators, reckless detectives as was proven during my trial.

17

I know justice will be served. I do believe in justice. I believe in the Constitution of the United States. I believe in logic and a rational—I mean, unfortunately the State had the advantage against me. I defend myself because I know that I'm not guilty [i]n this situation.

As I stated at the beginning, I'm the only victim in this as you know by being the one who I see your own words, you believe that I was—that even if the State was not able to prove beyond reasonable doubt that I commit[ted] the offense, you believe that I am guilty which is totally unfair, which goes against the values and principles of the People of the United States."

Defendant emphasized that the State did not prove beyond a reasonable doubt the identity of the offender and reiterated, "I'm being the victim of just a bunch of reckless people. I mean, I'm the real victim in this situation. I'm not guilty."

¶ 51 The trial court then announced its findings. At the outset, the court rejected the State's argument that defendant's lack of a criminal history, a legislatively mandated mitigating factor, was in this case an aggravating factor. The court also stated that it considered defendant's statement in allocution "very self-centered and frankly very, very arrogant." The court noted that defendant maintained his innocence, that it was his "absolute right" to do so, and that the court would not consider that fact in aggravation. The court reiterated that the circumstantial evidence against defendant was "overwhelming." The court further observed that the motive for this offense was that defendant believed he was "wronged," namely, that "sexual acts were conducted upon

him by the victim and the victim's family," but the court stated, "frankly, there is nothing that corroborates that whatsoever."

¶ 52    The trial court characterized the facts of the crime as "horrific," noting that the victim was "butchered" with over 45 wounds, including incise wounds that penetrated his organs, a broken nose and eye socket, as well as multiple bruising. The court further recounted that there was blood "all over the front of the building, leading from the building into the defendant's truck."

¶ 53    The trial court stated, however, that there was mitigation, including his "normal background," his work history, and good family relationship (despite the fact that "he left [his daughter] immediately after this incident for several years before he got caught"). The court found defendant's lack of a prior criminal history as mitigating and rejected the State's argument that it should consider this as an aggravating factor. The court noted there was nothing in his PSI except for "traffic offenses," which the court stated it would not consider. Overall, the court stated that his PSI contained "nothing that jumps out" that he would ever "try to spin or state that this is aggravating." The trial court further rejected the State's argument that a lengthy sentence was necessary for deterrence. The court expressed its doubt whether "deterrence actually works."

¶ 54    After reiterating that there were mitigating factors, the trial court stated it was returning to the "severity of this crime," observing that, "in my many years of working in the criminal justice system[,] I haven't really seen too many that were *** this bad." Describing the offense as an "extreme crime" and expressing its belief that the sentence will also be considered as extreme, the court stated that it would not disregard the severity of the crime and defendant's flight afterwards to avoid responsibility. The court further expressed its concern as to whether defendant could be restored to useful citizenship based upon his statement that he was "a victim of the corruption of

19

the court and he's the only victim in the case, ignoring the fact that [the victim] got butchered."

The court then sentenced defendant to 50 years' imprisonment. This appeal follows.

¶ 55                                    ANALYSIS

¶ 56                          Sufficiency of the Evidence

¶ 57    Defendant first contends that the State failed to prove him guilty of murdering Enriquez beyond a reasonable doubt. Defendant first notes that there were no witnesses to the murder and no physical evidence linking defendant to the crime scene. Defendant then argues that the evidence that the trial court relied upon—defendant's flight to Mexico after the murder and the fact that the victim's blood was found in defendant's truck—was insufficient to establish defendant's guilt beyond a reasonable doubt, warranting reversal of his conviction.

¶ 58    When presented with a challenge to the sufficiency of the evidence, this court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. De Filippo*, 235 Ill. 2d 377, 384-85 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It is not the function of this court to retry the defendant. *People v. Evans*, 209 Ill. 2d 194, 209 (2004). Rather, it is for the trier of fact to assess the credibility of the witnesses, determine the appropriate weight of the testimony, and resolve conflicts or inconsistencies in the evidence. *Id.* at 211. As a result, mere allegations that a witness was not credible will not justify reversal. *Id.* at 211-12; see also *People v. Manning*, 182 Ill. 2d 193, 211 (1998) (rejecting a similar challenge based upon "speculation that another person might have committed the offense"). It is axiomatic that a trier of fact is not required to accept any possible explanation compatible with a defendant's innocence and elevate it to the status of reasonable doubt. *People v. Herrett*, 137 Ill. 2d 195, 206 (1990). In essence, we will not reverse

a conviction unless the evidence is "so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt of defendant's guilt." *Evans*, 209 Ill. 2d at 209.

¶ 59    Section 9-1(a)(1) of the Criminal Code of 2012 (Code) provides in relevant part that a person commits first degree murder if he kills an individual without lawful justification and, in performing the acts which cause the death, either intends to kill or do great bodily harm to that individual, or he knows that such acts create a strong probability of death or great bodily harm to that individual.  720 ILCS 5/9-1(a)(1) (West 2014).

¶ 60    In this case, viewing the evidence in the light most favorable to the State, as we must (see *De Filippo*, 235 Ill. 2d at 384-85), there was overwhelming evidence establishing that defendant murdered the victim.  Defendant's two brothers testified to the grand jury that defendant had confided in them that he believed that the victim had drugged and sexually assaulted him months prior.  The victim's blood was found both outside and inside defendant's pickup truck, and there was no evidence anyone else had used that truck.  Immediately following the murder, defendant abruptly left for Mexico, leaving behind his young daughter, the mother of his daughter (Ochoa, with whom he lived), his family, and even his cell phone.  Defendant remained in Mexico for nearly seven years until he was arrested there and extradited to Illinois for prosecution.  Although defendant had previously spent time in Mexico, he had typically remained in contact with both his young daughter and Ochoa.  On this occasion, he never contacted them or the rest of his family.  Defendant's phone also indicated that its location was between his residence and the crime scene between 9 p.m. on the day before the victim was discovered and around 5 a.m. on the next day.

¶ 61    In addition, the victim's autopsy revealed multiple deep stab wounds—some of which penetrated his internal organs, defensive wounds, and evidence of strangulation.  The crime scene itself showed that the grass where the victim was found was "saturated" with blood, and there was

a virtual river of blood leading from the victim, down the walkway to the building, into the victim's apartment, and eventually to his bedroom. Blood spatters were also found on nearby parked cars and the building next to the victim's building. On these facts, the State established that the defendant committed the first degree murder of the victim.

¶ 62    Defendant points to the lack of defendant's DNA at the scene or on the various oral, anal, and penile swabs of the victim. Defendant further reiterates the argument at trial that (1) the victim's blood could have been found in the truck because of a work-related injury and (2) defendant's going to Mexico was consistent with prior occasions, including one occasion when he remained in Mexico for approximately one year. These matters, however, were already before the trial court, and it is not our function to retry defendant. See *Evans*, 209 Ill. 2d at 209. Moreover, as noted above, a trial court is not required to accept any possible explanation compatible with defendant's innocence and elevate it to the status of reasonable doubt. *Herrett*, 137 Ill. 2d at 206. Since the evidence is not "so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt of defendant's guilt," we may not reverse his conviction. See *Evans*, 209 Ill. 2d at 209. Accordingly, we reject defendant's first contention of error.

¶ 63                              Defendant's Closing Argument

¶ 64    Defendant next contends that the trial court violated defendants' constitutional rights when it prohibited defendant from arguing during his closing argument an "alternative theory" as to why the victim's blood was found inside his truck. Defendant argues that the court's improper limitation on defendant's closing argument prevented defendant from presenting a complete defense. Defendant concedes that he failed to preserve this error in the court below, but he asks that we review this issue under the first prong of the plain error doctrine.

¶ 65 The plain error doctrine allows a reviewing court to bypass normal forfeiture principles and consider an otherwise unpreserved error affecting substantial rights when either: "(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 187 (2005); see also Ill. S. Ct. R. 615(a). "The plain-error doctrine is a narrow and limited exception." *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). Defendant only argues that the first prong of the plain error analysis applies, *i.e.*, "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error." *People v. Bever*, 2019 IL App (3d) 170681, ¶ 38 (citing *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Put simply, the defendant must prove "prejudicial error." *Id.* at 187. However, before considering whether the plain-error exception applies, we must first determine whether any error occurred. *Id.*

¶ 66 "A criminal defendant's right to make a closing summation before the finder of fact is a fundamental right derived from the sixth amendment guarantee of assistance of counsel." *People v. Stevens*, 338 Ill. App. 3d 806, 810 (2003); see also *Herring v. New York*, 422 U.S. 853, 858 (1975) ("There can be no doubt that closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial."). For the defense, closing argument represents "the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt." *Id.* Nonetheless, the trial court retains broad discretion to limit the scope of closing argument. *People v. Burnett*, 237 Ill. 2d 381, 389 (2010); see also *Herring*, 422 U.S. at 862 (holding that trial judges have "great latitude in controlling the duration and limiting the scope of closing summations"). This includes regulating the substance and style of closing arguments. *People v. Blue*, 189 Ill. 2d 99, 128 (2000). We may not disturb the court's determination of the propriety of closing remarks absent "a clear abuse of discretion." *Id.* An abuse of discretion occurs

when the trial court's decision is " 'arbitrary, fanciful or unreasonable,' " or where " 'no reasonable person would agree with the position adopted by the trial court.' " *People v. Simmons*, 2019 IL App (1st) 191253, ¶ 9 (quoting *People v. Becker*, 239 Ill. 2d 215, 234 (2010)).

¶ 67     In this case, there is nothing in the record before us to suggest that the trial court abused its discretion in precluding defendant's *pro se* closing argument that his truck "was used for work" and that type of work is hard work that requires tools and where "many people get hurt." The court was correct in stating that there was no evidence that the pickup truck was ever used for defendant's job, nor was there any testimony regarding the type of tools used for that job or that the job resulted in many people getting injured. Furthermore, the court merely explained to defendant that he could argue inferences, but not facts that were never introduced. Afterwards, defendant then proceeded to complete his argument. Although "a total denial of the opportunity for final argument in a nonjury criminal trial is a denial of the basic right of the accused to make his defense" (*Herring v. New York*, 422 U.S. 853, 859 (1975)), a trial court nonetheless has "great latitude in controlling the duration and limiting the scope of closing argument" (*id.* at 862). Here, the court did not totally deny defendant's opportunity to make his closing argument; the court limited defendant—on only one occasion—from arguing a fact that was not in evidence. The court otherwise allowed defendant to make his lengthy closing argument and even a quasi-surrebuttal to the State's subsequent rebuttal closing argument. This was well within the court's wide latitude that it has to limit the scope of closing argument. See *id.*

¶ 68     Moreover, defendant's citation to *People v. Manion*, 67 Ill. 2d 564 (1977), is unpersuasive. There, the court *affirmed* the defendant police officer's conviction, and the issue relevant to that case involved the trial court's refusal to allow the defendant to *testify* regarding his actions on prior occasions. *Id.* at 576-78. Defendant's reliance upon *Manion* is thus misplaced.

¶ 69    Accordingly, the trial court did not abuse its discretion because its limitation on defendant's improper closing argument was neither arbitrary, fanciful, unreasonable, nor one that no reasonable person would take.  See *Simmons*, 2019 IL App (1st) 191253, ¶ 9 (quoting *Becker*, 239 Ill. 2d at 234).  Consequently, the plain error doctrine is unwarranted because there is no error (see *Herron*, 215 Ill. 2d at 187), and we must honor defendant's forfeiture of this claim.

¶ 70                                    Defendant's Sentence

¶ 71    Finally, defendant contends that his 50-year sentence is excessive.  Specifically, defendant argues that the 50-year sentence fails to reflect an appropriate balancing of rehabilitation and retribution, with the objective of restoring defendant to useful citizenship.  Defendant adds that the sentence also fails to adequately account for the fact that defendant had no prior criminal history and other mitigating evidence indicative of his rehabilitative potential.  Defendant asks that we either reduce his sentence or remand the matter for a new sentencing hearing.

¶ 72    In imposing a sentence, the trial court must balance relevant factors, such as the nature of the offense, the protection of the public, and the defendant's rehabilitative potential.  *People v. Alexander*, 239 Ill. 2d 205, 213 (2010).  The trial court has a superior opportunity to evaluate and weigh a defendant's credibility, demeanor, character, mental capacity, social environment, and habits.  *Id.*  In addition, a trial court is not required to expressly outline its reasoning for sentencing, and absent some affirmative indication to the contrary (other than the sentence itself), we must presume that the court considered all mitigating factors on the record.  *People v. Perkins*, 408 Ill. App. 3d 752, 762-63 (2011).  Since the most important sentencing factor is the seriousness of the offense, the court is not required to give greater weight to mitigating factors than to the seriousness of the offense, and the presence of mitigating factors neither requires a minimum sentence nor precludes a maximum sentence.  *Alexander*, 239 Ill. 2d at 214.

¶ 73    A sentence within statutory limits is reviewed for an abuse of discretion, and we may only alter such a sentence when it varies greatly from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Id.* at 212.  So long as the trial court does not ignore pertinent mitigating factors or consider either incompetent evidence or improper aggravating factors, it has wide latitude in sentencing a defendant to any term within the applicable statutory range. *Perkins*, 408 Ill. App. 3d at 762-63.  This broad latitude means that this court cannot substitute its judgment simply because it might have weighed the sentencing factors differently. *Alexander*, 239 Ill. 2d at 212-13.

¶ 74    In this case, the trial court did not abuse its discretion.  The sentencing range for first degree murder is from 20 to 60 years' imprisonment.  See 730 ILCS 5/5-4.5-20(a)(1) (West 2022).  Since defendant's sentence falls within the sentencing range, we may only disturb the sentence if it varies greatly from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Alexander*, 239 Ill. 2d at 212.  Neither exception applies in this case.

¶ 75    Here, contrary to defendant's claim, the trial court did not consider defendant's failure to admit his guilt in fashioning the sentence.  The court found defendant's statement in allocution that he was the "only" victim in this case "very arrogant" because of the plain fact that the victim was "butchered"—this court has had the opportunity to view the crime scene and the victim's autopsy photos, and we fully agree with that description.  Defendant's assertion that it is "implicit" from the court's comments that it considered his failure to admit his guilt is meritless.

¶ 76    The trial court also stated that it had considered defendant's strong work history and family ties, as well as his lack of a prior criminal history as mitigating factors.  Notably, the court rejected the State's argument that defendant's lack of a criminal history, which is considered only as a mitigating factor pursuant to section 5-5-3.1(a)(7) of the Unified Code of Corrections (730 ILCS

5/5-5-3.1(a)(7) (West 2022)), should nonetheless be considered as an aggravating factor. See *People v. Kuntu*, 196 Ill. 2d 105, 139-44 (2001) (granting plain error review and vacating the defendant's death sentence where the State argued to the jury to consider the defendant's lack of criminal history as an aggravating factor, which was "directly opposite to the way in which the legislature intended" and "clearly improper and prejudicial").

¶ 77    Moreover, the evidence at trial revealed that the victim suffered 45 stab or incise wounds and multiple blunt force injuries, 15 of which were on his head and neck, including 11 deep stab wounds. Among these sharp force injuries was a 4-inch-deep stab wound to the right side of the victim's neck that injured his jugular vein, a 2.25-inch-deep stab wound to the back of his neck that was deep enough to injure the back of his esophagus, and a 5-inch-deep stab wound to the left side of his face that further injured the esophagus near the hyoid bone. The victim's torso showed 21 sharp force injuries, several of which penetrated up to 3.5 inches into his body, injuring various internal organs such as the bladder and small intestine, and another that resulted in "loops" of his bowel protruding through the abdominal wall. The victim's hands revealed several defensive wounds, and there was another possible defensive wound on his right forearm that comprised of two connected 2.5-inch-deep stab wounds that passed through the soft tissue.

¶ 78    As to the blunt force injuries, there were "multiple" bruises about the victim's face, head, neck, jaw, and extremities, including his testicles. The victim further suffered (1) a fractured nose, (2) a fractured hyoid bone with petechial hemorrhages in his left eye that may have resulted from strangulation or suffocation, (3) a subdural hemorrhage, and (4) a hemorrhage of the scalp.

¶ 79    Turning to the crime scene, it was almost literally awash in blood: the grass around the victim's body was "saturated" with it, and there was a path of blood leading from the victim down the sidewalk, through the entrance of the victim's building, down the stairs to his apartment, and

into his bedroom in the back of the unit. There was blood "everywhere" in the bedroom, including the ceiling and walls as well as the mattress and floor. Adding to this macabre scene, there was also blood on the building next door, and the victim's DNA was even found in blood splattered on one of the parked cars nearby. Officers further observed "numerous" blood stains on the exterior and interior driver's side of defendant's pickup truck, which testing later revealed to contain the victim's DNA, including one swab taken from the blood-stained steering wheel.

¶ 80 The evidence additionally established that defendant fled to Mexico immediately after the murder and remained there for nearly seven years until he was apprehended by a joint operation involving Mexican law enforcement and the FBI.

¶ 81 The court properly considered the seriousness of the offense as the most important sentencing factor and was not obligated to give greater weight to mitigating factors than to the seriousness of the offense. *Id.* at 214. Furthermore, whatever mitigating factors were present did not prevent a maximum sentence from being imposed. *Id.* We cannot substitute our judgment simply because we might have weighed the sentencing factors differently. *Id.* at 212-13.

¶ 82 This was nothing less than the cruel and ruthless slaughter of another human being, which exhibited a depraved indifference to humanity. Under these exceptionally grotesque facts and circumstances, the trial court's sentence—albeit arguably lengthy in light of defendant's lack of a documented criminal history—was within the sentencing range, and it neither varies greatly from the spirit and purpose of the law nor is manifestly disproportionate to the nature of the offense. As such, we may not disturb it. *Id.* at 212. The court therefore did not abuse its discretion.

¶ 83 We further reject defendant's reliance upon *People v. Juarez*, 278 Ill. App. 3d 286 (1996). There, this court held that the defendant's 14-year sentence was excessive because the sentencing judge did not discuss *any* aggravating factors or give "serious consideration to evidence in

mitigation or rehabilitative potential," necessitating a reduction in the defendant's sentence. *Id.* at 295. Here, by contrast, the trial court thoroughly discussed both aggravating and mitigating factors prior to imposing sentence. *Juarez* is unavailing, and defendant's claim is thus meritless.

¶ 84                                        CONCLUSION

¶ 85    For the foregoing reasons, the evidence was sufficient to convict defendant of first degree murder. In addition, the trial court did not improperly limit defendant's closing argument. Finally, we reject defendant's claim that his sentence is excessive. Accordingly, we affirm the judgment of the circuit court of Cook County.

¶ 86    Affirmed.